UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

GEOFFREY CAMPAU,

    Plaintiff,

v.

CITY OF STERLING HEIGHTS,

    Defendant.

Case No. 25-cv-
Hon.

| |
|---|
| ERIC STEMPIEN (P58703) <br> MALLORIE M. BLAYLOCK-DANNA (P84331) <br> STEMPIEN LAW, PLLC <br> Attorneys for Plaintiff <br> 38701 Seven Mile Road, Suite 445 <br> Livonia, MI 48152 <br> (734)744-7002 <br> eric@stempien.com <br> mallorie@stempien.com |

## COMPLAINT AND JURY DEMAND

Plaintiff, GEOFFREY CAMPAU, by and through his attorneys, Stempien Law, PLLC, hereby complains against Defendant, CITY OF STERLING HEIGHTS, and in support thereof states:

1. Plaintiff GEOFFREY CAMPAU ("Campau" or "Plaintiff") is a resident of the City of Sterling Heights, Macomb County, Michigan.

2. Defendant CITY OF STERLING HEIGHTS ("City" or "Defendant") is a political subdivision of the state of Michigan.

1

3. Jurisdiction is vested with this Court pursuant to 29 USC §1132(e)(1), 29 USC §2601, et. seq., and 28 USC §1331.

4. Venue is proper in this District pursuant to 28 USC §1391(c) and (d), and 29 USC §1132(e)(2).

## COMMON ALLEGATIONS

5. Beginning on or about February 28, 2016, Campau began his employment with the City's Fire Department. Campau was employed as an EMT Paramedic Firefighter at the time the City terminated his employment.

6. On or about November 26, 2024, when Campau was replacing the 100 ft. hose on a City firetruck, he felt a slight twinge in his back, but nothing alarming and not debilitating, only somewhat achy.

7. Campau continued to perform his work, including moving the 100 ft. roll of hose.

8. Campau did not give the slight twinge a second thought, as he has a history of sciatica and muscle strain from a long-ago sport-related injury, which has been under control since before he started working for the City in 2016.

9. After work on November 26, 2024, Campau's back pain intensified, so he presented to the Emergency Room where he was prescribed pain medication and muscle relaxers. The pain soon thereafter subsided on its own.

2

10. On November 27, 2024, Campau's day off work, he called in to call off of work on November 28, 2024, as his Union contract provides that he is permitted to take 'sick time' off work if he must miss work for reasons related to being the primary care giver for his children.

11. Campau called off work on November 28, 2024 because his wife had to work that day and he had to stay home with his children, as his children's primary care giver.

12. When Campau called in, he called the acting on-duty Battalion Chief, Captain Vincent Schwartz ("Captain Schwartz"). Captain Schwartz instructed Campau to email his time-off request to the Battalion Chief Group, which Campau never had to do previously.

13. Campau complied and advised the Battalion Chief Group that he was the primary care giver for his children, that his wife – a nurse – was working on November 28, 2024, and that he had to stay home to care for his children as a result.

14. Assistant Chief Ammormino emailed Campau stating that Campau's wife having to work is not a valid reason to take time off and he instructed Campau to present at work in the morning.

15. Campau emailed Captain Schwartz, advised him that Campau's request was denied, and that he would be there in the morning, on November 28, 2024.

16. Later that evening, Campau's wife took a COVID-19 test, which was positive. As such, Campau called in to work again, told Captain Schwartz that he had to take off work on November 28, 2024 because his wife had Covid, acknowledged that he knows it looked rather suspicious, and provided his CVS receipt to show that the Covid test was not even purchased until after his request for primary care giver leave was denied.

17. Captain Schwartz told Campau that his wife having Covid was a valid reason to take work off and he approved Campau's leave for November 28, 2024.

18. On November 30, 2024, Campau woke up with a fever and called off work. Later that day, he assisted his wife with moving an object in the early evening hours that was relatively light weight.

19. Upon assisting his wife with moving the object, Campau felt the same feeling in his back that he felt on November 26, 2024.

20. Campau then presented to the ER, x-rays were performed, he was given a steroid injection, was prescribed a mild muscle relaxer, steroid, and pain patch, and was ultimately advised by physicians that it was just a sciatic issue.

21. From November 30, 2024 through December 3, 2024, Campau was scheduled to work overtime, however, the on-duty Battalion Chief advised Campau that his overtime was cancelled by the City's fire department.

4

22. Upon information and belief, Campau's overtime was cancelled in retaliation for him taking off work on November 28, 2024.

23. On December 4, 2024, Campau worked a normal 24-hour overtime shift without incident.

24. On December 5, 2024, Campau and two of his colleagues responded to a call in which the three of them had to jointly lift an individual weighing in excess of 300 pounds. However, upon lifting the individual, Campau felt pain across his back and down his right leg.

25. Campau's December 5, 2024 injury was caused by the heavy lifting of the individual weighing in excess of 300 pounds.

26. Campau reported his back pain to the ambulance's driver, at the scene of the injury, on December 5, 2024.

27. Campau reported his back pain to the on-site Lieutenant, Grady, on December 5, 2024 immediately upon their return to the Station. On-site Lieutenant Grady called Battalion Chief Duncan and Campau then completed a 3-step paperwork process.

28. Campau completed step 1; a write-up for his December 5, 2024 injury on the City's on-the-job injury form. In response to the question of whether he had been treated for this injury before, Campau stated 'no,' as it was not the same injury he suffered previously, the prior injury was related to his sciatica, he was

suffering from different symptoms, there was no prior shooting leg pain, and there was no prior numbness or tingling in his foot.

29. Campau completed step 2; a Firefighter Casualty Injury Form, which is attached to the National Fire Fighter Incident Reporting System for that run and includes dispatch times, personnel on scene, any dispatch info that they may have typed in, and firefighter.

30. Campau completed step 3; an ESO report.

31. The City did not take issue with how Campau completed steps 2 and 3, however, the City took issue with Campau's contention on the City's on-the-job injury form, i.e. that he had not been previously treated for the injury he suffered on December 5, 2024.

32. On December 5, 2024 around 8:00 a.m., a couple hours after his injury, Campau presented to the ER at Henry Ford for emergency medical treatment and was dropped off by Battalion Chief Ducan who saw Campau get out of the vehicle with difficultly and then walk into the ER with difficulty.

33. The Henry Ford ER physician advised Campau that his back pain was related to sciatica and he was prescribed medication before being released.

34. The Henry Ford ER physician failed to take any x-rays and barely performed a physical examination.

6

35. When Campau's wife – a nurse – presented to the ER to pick him up, she and Campau agreed that Campau should present to the ER at Corewell Health for competent examination and treatment.

36. Campau called Battalion Chief Vergauen to inform him of this, however, Campau was advised that going to Corewell Health for further treatment might raise some "red flags" because he was not following workers compensation protocols.

37. Concerned for his physical wellbeing and knowing that he received unreasonable treatment and diagnosis at Henry Ford, Campau presented to Corewell Health's ER for *actual* treatment.

38. At Corewell Health, Campau was admitted as an inpatient from December 5, 2024 through December 7, 2024.

39. On December 5, 2024, x-rays were performed, a neurologist was seen, Campau underwent pain management for the severe pain he was in by that point, and MRIs were performed which revealed what Henry Ford did not bother to test for: disc herniations from L5 to S1.

40. On December 6, 2024, Campau underwent pain management/physical therapy, and saw an orthopedic surgeon who recommended that Campau undergo surgery, a microdiscectomy, that evening. Campau declined only to determine if he could improve with just pain management/physical therapy.

41. On December 7, 2024, Campau was released from Corewell Health and was off work for the remainder of the day.

42. Campau provided the City with documentation concerning his treatment at Corewell Health.

43. On December 17, 2024, Campau and his orthopedic surgeon agreed that Campau would undergo a microdiscectomy surgery due to how significant Campau's pain and injuries were.

44. On December 31, 2024, Campau underwent the microdiscectomy due to the injuries he suffered on December 5, 2024.

45. Following the surgery, Campau was instructed to take 6 weeks off work, to not perform any heavy lifting, to get ample rest, and to not return to work until after his February 11, 2025 follow up appointment.

46. From about December 2024 through about January 2025, Campau worked with the City's workers compensation administrator, CompOne Administrators, Inc. ("CompOne"), to secure workers compensation benefits. Campau worked with CompOne to secure his medical records and corresponded with CompOne fairly regularly; Campau diligently tried to obtain his medical records from MRO, CompOne's third-party records vendor, to no avail; CompOne's deadline to be in receipt of Campau's records was approaching; Campau communicated with CompOne about the difficulty he was having with securing his medical records

8

from MRO; because of the approaching deadline, CompOne employee, Melissa Gibson, instructed Campau to sign a release so she could get his records; then Melissa Gibson emailed Campau stating that she was not going to be able to get Campau's records either; so Campau went to the ER, got a copy of his records himself, and provided them to CompOne; then Melissa Gibson told Campau that he missed the deadline to provide CompOne with his records.

47. Campau was then denied workers compensation benefits. He received a Notice of Dispute, stating that he failed to provide his records to CompOne by CompOne's deadline.

48. On February 11, 2025, Campau presented for his follow-up appointment with his orthopedic surgeon and Campau was medically cleared to return to work as of February 15, 2025.

49. On February 11, 2025, Campau provided Assistant Chief Ammormino with the documentation medically clearing Campau to return to work.

50. On February 13, 2025, Campau was notified that he was on administrative leave.

51. On February 27, 2025, a Garrity Meeting was held. Lying during a Garrity Meeting is a fireable offense.

52. During the Garrity Meeting, Campau was accused of lying about whether he took medication during a specific time frame. In reality, Campau simply forgot

that he was taking medication during the subject time frame and quickly corrected himself when he recalled that he was taking medication during that time.

53. During the Garrity Meeting, Campau was accused of violating the City's policy concerning marijuana use.

54. Interestingly, Campau has knowledge of a firefighter employed by the City, Mr. Taylor, who was caught smoking marijuana at work, on-the-job. Mr. Taylor's conduct was reported by the individual who is now the City's current Union President. Mr. Taylor's employment was not terminated, but rather he was subject to a "last chance" agreement for 3 years.

55. On April 7, 2025, a Loudermill meeting was held between Campau, the City's Human Resources ("HR"), Fire Chief Edmonds, the Police Chief, and a City attorney.

56. Frivolous, meaningless, and moot Charges were brought against Campau at the Loudermill meeting, alleging that: Campau failed to report a claimed injury sustained in November 2024; he lied about why he called off work on November 2024; he failed to report that he had been to the ER, was prescribed medication, and was told to stay off of work on November 30, 2024; his doctor's note was inconsistent with his ER physician's instructions; Campau's medical documentation does not support his claim that the November 30, 2024

and December 5, 2024 incidents are not the same incident or injury; Campau falsely stated that he had not been treated for his back injury prior to December 5, 2024; he violated the City's zero-tolerance policy concerning marijuana; and that he offered conflicting statements about whether he had taken medications he was prescribed on November 30, 2024.

57. Campau was advised that he could involuntarily resign and get his pension or, in the alternative, be terminated.

58. Campau's employment was terminated, effective April 30, 2025.

## COUNT I – VIOLATION OF FMLA – INTERFERENCE

59. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

60. Campau was an eligible employee as that term is defined by the FMLA.

61. Defendant is a covered employer as that term is defined by the FMLA.

62. Campau's medical leave was protected by the FMLA.

63. Campau's position as EMT Paramedic Firefighter should have been protected by the FMLA until his return to work on February 15, 2025.

64. Defendant interfered with Campau's rights under the FMLA by placing him on administrative leave and terminating his employment.

65. As a direct and proximate result of Defendant's interference with Campau's FMLA rights, Campau suffered damages, including, but not limited to: wage

loss, lost employment benefits and lost pension benefits, plus interest, costs and attorney fees as allowed by statute.

66. Further, because Defendant's violation of FMLA was not in good faith and Defendant did not have reasonable grounds for believing that the administrative leave and termination was not a violation of FMLA, Plaintiff is entitled to an award of liquidated damages pursuant to 29 USC §2617(a)(1).

## COUNT II – VIOLATION OF FMLA – RETALIATION/DISCRIMINATION

67. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

68. By placing Campau on administrative leave and terminating his employment, among other reasons that will be revealed through this matter's litigation, Defendant retaliated and/or discriminated against Campau for exercising his FMLA rights.

69. As a direct and proximate result of Defendant's violation of the FMLA, Plaintiff suffered damages as fully set forth herein.

WHEREFORE Plaintiff requests that this Honorable Court enter judgment in his favor and against the Defendant reinstating Plaintiff to an appropriate position with Defendant; awarding Plaintiff compensatory damages in an amount to be determined at trial in this matter; awarding Plaintiff punitive damages in an amount to be determined at trial; an award to Plaintiff for attorney fees, costs of litigation,

and interest; and an order granting Plaintiff further relief that this Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of the within cause.

                    Respectfully submitted,

                    STEMPIEN LAW, PLLC

                    */s/ Mallorie M. Blaylock-Danna*
                    MALLORIE M. BLAYLOCK-DANNA (P84331)
                    Attorneys for Plaintiff
                    38701 Seven Mile Road, Suite 445
                    Livonia, MI 48152
                    734-744-7002
                    mallorie@stempien.com

Dated: September 5, 2025